UNITED STATES BANKRUPTCY COURT
FOR THE
WESTERN DISTRICT OF KENTUCKY

| | | |
|---|---|---|
| IN RE: | ) | |
| JULIE MARIE WOOD | ) | CASE NO. 18-32555 |
| Debtor | ) | CHAPTER 7 |
| ——————————————— | ) | |
| | ) | |
| MICHAEL WHEATLEY, | ) | |
| in his capacity as Chapter 7 Trustee | ) | A.P. No. 19-3041 |
| Plaintiff | ) | |
| vs. | ) | |
| | ) | |
| JACK WOOD, | ) | |
| JENNIFER WOOD, and | ) | |
| MARGARET WOOD | ) | |
| Defendants | ) | |
| ——————————————— | ) | |

**MEMORANDUM**

The above-styled adversary proceeding comes before the Court on the Trustee's Motion to Approve Settlement Agreement with Defendants Jack D. Wood, Jennifer D. Wood, and Margaret Wood Pursuant to Federal Rule of Bankruptcy Procedure 9019 (the "Motion") filed by the Chapter 7 Trustee, Michael E. Wheatley, for the Bankruptcy Estate of Julie Marie Wood ("Trustee"). In the Motion, the Trustee seeks approval of a Settlement Agreement with the Defendants, Jack Wood, Margaret Wood, and Jennifer Wood (collectively referred to as "Defendants"). The Defendants are the father, mother, and sister of the Debtor, Julie Wood ("Debtor"). Creditor Janice Gerstenecker ("Gerstenecker"), by counsel, objected to the Motion. The Court conducted an evidentiary hearing on the Motion on July 14, 2021. The Trustee, the Defendants, and Gerstenecker all appeared, with counsel. As discussed more fully below, based upon the evidence presented and the record in this case, the Court will not approve the settlement.

**I. JURISDICTION**

The court has jurisdiction over this Chapter 7 bankruptcy case. 28 U.S.C. § 1334. The case, and all related proceedings and contested matters, have been referred to this bankruptcy court for determination. 28 U.S.C. § 157(a). The matter before the court is a core proceeding and this court has authority to enter a final order. 28 U.S.C. § 157(b)(2)(A) and (O); *see In re Junk*, 566 B.R. 897, 904 (Bankr. S.D. Ohio 2017) ("bankruptcy courts have the constitutional authority to enter final orders approving settlements under Rule 9019(a) of the Federal Rules of Bankruptcy Procedure"); *In re Full Spectrum Management*, LLC, 621 B.R. 421, 424 (Bankr. W.D. Mich. 2020) (Same.)

## II. FACTUAL BACKGROUND

On August 21, 2018, the Debtor filed for relief under Chapter 7 of Title 11 of the United States Code in the United States Bankruptcy Court for the Western District of Kentucky.  On that same date, the Trustee was appointed to administer the Debtor's bankruptcy estate.  During the course of the case, the Debtor moved to convert her case to Chapter 13 (the "Motion to Convert"). Both the Chapter 7 Trustee and Gerstenecker opposed the motion.  Gerstenecker is far and away the Debtor's largest creditor, and indeed, is the only creditor to file a claim in the Chapter 7 bankruptcy case.

While the Motion to Convert was being considered, Gerstenecker filed an adversary proceeding against the Debtor objecting to her discharge under the provisions of 11 U.S.C. § 727. Eventually, the Debtor withdrew her answer in that adversary proceeding, and Gerstenecker moved for a default judgment which this Court granted on June 28, 2019.  That default judgment set forth the amounts owing to Gerstenecker (an amount exceeding $100,000, plus accruing interest) and further held that the Debtor's discharge would be denied pursuant to 11 U.S.C. §§ 727(a)(2)(A), (a)(3), (a)(4)(A), (a)(5), and (a)(6)(A).   This adversary proceeding was closed on July 23, 2019.

2

During the course of the evidentiary hearing on the Debtor's Motion to Convert, certain facts were brought to light regarding the Debtor's ownership in a real estate partnership/venture with her parents  (Jack and Margaret Wood) and her sister, Jennifer Wood. Specifically, It was revealed that the Debtor owned a 20% interest in a real estate venture with her parents and sister (the "Joint Venture").  With this ownership interest, the Debtor was able to claim the Joint Venture's business losses to offset her income on her federal income taxes.  Doing so resulted in the Debtor paying little to no income taxes for several years.  When asked about the Joint Venture, the Debtor claimed no knowledge, which was consistent with her testimony to the majority of questions asked of her.

Jack Wood testified under oath regarding the Debtor's tax returns and deductions.  He responded "Yes, that was a joint venture between my wife, myself, Jennifer, and [the Debtor]." (Main Case Doc. No. 44, Tr. 116:12-13) Later, he was  specifically asked "Is the business a joint venture?"  To which, Jack Wood responded "Yes."  (M.C. Doc. No. 44, Tr. 117:9) When asked if there was any paperwork for the Joint Venture, he testified that there was not.  In his view a joint venture was a "business term and it's very flexible, according to the IRS."  (M.C. Doc. No. 44, Tr. 117:14-15)  Jack Wood also testified that, after problems developed between the Debtor and Gerstenecker, he decided he did not want the Debtor to continue in the Joint Venture.  Consequently, he unilaterally removed the Debtor from the Joint Venture.  He further stated that he did not discuss removing the Debtor from the Joint Venture prior to taking those actions.  Later during his testimony, when asked by the Court to clarify the notations on the Debtor's tax returns reflecting percentages between the Defendants and the Debtor, Jack Wood testified that the handwritten notations were the "division of the joint venture." (M.C. Doc. No. 44, Tr. 150:3-4).

The Court will also note at this juncture that the Trustee asked no questions during the course

3

of this evidentiary hearing.  Nor did the Trustee introduce any exhibits supporting his objection to the Motion to Convert. He was, to a large part, just a passive observer of the efforts Gerstenecker was undertaking to prevent the case from converting to Chapter 13.

Following the evidentiary hearing, on May 15, 2019, the Court entered its Memorandum and Order denying the Debtor's Motion to Convert.  In its ruling, the Court cited to the Debtor's tax returns, wherein she claimed a 20% interest in the Joint Venture.  The Court further found that Jack Wood confirmed this ownership interest of the Debtor in the Joint Venture.  (Doc. No. 45 at 5).  The Court also found that the Debtor was divested of this interest as a result of a unilateral decision of Jack Wood.  The Debtor received nothing in return for giving up her interest in the real estate business.  Mr. Wood did not feel the Debtor was entitled to any compensation for removing the Debtor from the joint venture.  *Id.* at 6.

In its decision denying the Motion to Convert, the Court noted that allowing the Debtor to convert to Chapter 13 would mean that Gerstenecker would only recover some $6,600 on her claim. *Id.* at 19.  The Court concluded by finding that the Motion to Convert was "just another attempt by the Debtor to avoid paying on the debt owed to Gerstenecker, which she has disputed from the beginning" and that "[from] the outset, this bankruptcy case has been designed to thwart Gerstenecker." *Id.* at 20.  For these reasons, and more as set forth in he Memorandum and Order, the Court denied the Debtor's Motion to Convert.

Shortly after the Court denied the Motion to Convert, the Chapter 7 Trustee filed an Application to Employ Neil C. Bordy of Seiller Waterman LLC as Counsel for Chapter 7 Trustee ("Bordy").  Said application was based upon an hourly compensation agreement, with Bordy billing his normal billing rate of $325.00 per hour.  (Doc. No. 52) The Trustee also filed a Request that

4

Assets be sent to all creditors. Thereafter, a Notice of Assets was sent to all creditors on May 30, 2019, directing all creditors to file a proof of claim if they sought any distribution. Only Gerstenecker filed a claim. Without objection, the Court approved the Trustee's application to employ Bordy on June 19, 2019.

On, May 24, 2019, Gerstenecker filed a Motion for Order Awarding Attorney Fees as a Sanction for Debtor's Bad Faith Conduct. (Doc. No. 49) In the motion, Gerstenecker sought an award of approximately $43,978.70, representing attorney fees incurred from the filing of this bankruptcy case. While the Court found it had the authority to enter such an order, it declined Gerstenecker's request. The Court noted the numerous examples of the Debtor intentionally omitting and misrepresenting items on her bankruptcy schedules, but also found that the Debtor's father, Jack Wood, was "somewhat instrumental in the confusing circumstances surrounding the Debtor's financial situation." (Doc. No. 75 at 1-2) "While the Debtor bears the ultimate responsibility for filing inaccurate schedules, the Court will not ignore the role that the Debtor's father played." *Id.* at 4. The Court found that the Trustee could "very well recover other assets from the Debtor, as well as other parties." *Id.* at 2.

On December 2, 2019, the Trustee filed this adversary proceeding against the Defendants seeking to avoid and recover certain prepetition transfers of property of the estate pursuant to 11 U.S.C. §§ 542, 544, 547, 548, 550, and 551; KRS § 378A, et seq.. The complaint alleged several bank accounts that were, in part, funded by tax refunds issued to the Debtor. The complaint further alleged that Jack Wood closed the accounts due to the decision reached by the Alabama Supreme Court affirming the indebtedness owed by the Debtor to Gerstenecker. Paragraphs 32-38 of the complaint concerned the Debtor's interest in the Joint Venture. Specifically, ¶ 35 stated that Jack

5

Wood testified that the handwriting signifies the division of a Joint Venture, with the Debtor possessing a 20% interest, Jack and Margaret possessing a combined 60% interest, and Jennifer possessing a 20% interest. Paragraph 36 alleged that Jack and Margaret Wood unilaterally decided to remove the Debtor from the real estate Joint Venture. Finally, ¶ 37 alleged the Debtor was not compensated for the termination and transfer of her 20% interest in the Joint Venture.

Jack Wood, *pro se* and as Counsel for Margaret and Jennifer Wood, filed an answer on February 7, 2020. (A.P. Doc. No. 4) In that answer, the Defendants admitted the allegations of paragraphs 33-36, among others. In other words, the Defendants confirmed what was testified to at the evidentiary hearing on the Motion to Convert – that the Debtor owned a 20% interest in the Joint Venture. The Defendants denied the allegation in ¶37, that the Debtor was not compensated for the termination of her interest. The meaning being that the Defendants asserted the Debtor was compensated for her interest.

On June 18, 2020, the Trustee moved for summary judgment. (A.P. Doc. No. 18) This motion was predominantly based upon Requests for Admissions to which the Defendants had not timely responded. In light of the import of the failure to respond, the Defendants, now represented by counsel, moved for an extension of time to respond to discovery (A.P. Doc. No. 23) and for leave to withdraw the admissions (A.P. Doc. No. 24). The Court granted the Defendants' motions and allowed the late responses and the withdrawal of the admissions by orders entered on August 11, 2020. (A.P. Doc. Nos. 30 and 31) In light of the admissions being withdrawn, and a fact question as to damages, the Court denied the motion for summary judgment on August 11, 2020. (A.P. Doc. No. 32) The Court made no comments or otherwise opined about the validity or strength of the Trustee's case. Upon motion by the Trustee, the Court did award attorney fees to Bordy in the

6

amount of $5,000 representing fees incurred due to the Defendants' failure to timely respond to discovery requests.

In November 2020, the parties moved for mediation, which this Court granted. A mediation was held before Judge Joan Lloyd on December 2, 2020. Not being a party to the complaint, Gerstenecker did not participate in the mediation. At that mediation, the parties were able to reach a settlement. When consulted about the terms of the settlement, Gerstenecker, the only creditor, informed the Trustee that she did not agree with the settlement and that she would object to the settlement. [1]

Notwithstanding Gerstenecker's opposition, on January 8, 2021, the Trustee filed the Motion to Approve Settlement currently before the Court.   The terms were as follow:

---

[1] Testimony was later presented as to the exact negotiations that went on during the mediation, as well as the offer that was proposed to Gerstenecker. As such evidence is inadmissable, the Court will simply note that Gerstenecker opposed the settlement. See Fed. R. Evid. 408.

Settlement Terms. Within seven (7) days of the Parties executing this Agreement, the Trustee shall file a Motion to Approve the Agreement pursuant to Bankruptcy Rule 9019 (the "Settlement Motion"). Within seven (7) days of the Bankruptcy Court approving the Settlement Motion, the Trustee shall file the attached Consent to Judgment (the "Consent to Judgment") and Judgment (the "Judgement") with the Bankruptcy Court. By way of this Agreement and the attached Judgment, the Parties agree that judgement shall be entered against the Defendants, jointly and severally, and in favor of the Trustee in the amount of $45,000.00; provided, however, if monthly payments are made timely to the Trustee in the amount of $4,000.00 per month for ten (10) consecutive months, with the first payment being due and owing on or before January 1, 2021 and each successive payment to be paid on the first day of each month thereafter for a total of $40,000.00, then the $45,000.00 judgment shall be satisfied in full. If any monthly payment is received after the 5th of the month or not in the full amount of $4,000.00, this will constitute a default ("Default"). In the event of a Default, the remaining balance becomes due and that balance will begin to accrue interest at 5% per annum. Further, in the event of a Default, the Defendants will be jointly and severally liable for all attorney's fees and costs associated with the collection of the Judgment.

Mutual Release. Upon the entry of the Judgment and the satisfaction thereof, the Trustee, on behalf of himself and Debtor and the Estate, hereby releases and forever discharges the Defendants from any and all claims and causes of action arising from or related to the avoidance of the Alleged Transfers and Judgment. Upon the entry of the Judgment and the satisfaction thereof, the Defendants hereby release and forever discharge the Trustee, on behalf of himself and Debtor and the Estate, from any and all claims and causes of action arising from or related to the avoidance of the Alleged Transfers and Judgment.

(Doc. No. 46 at 3).

As she warned, Gerstenecker filed an objection to the Motion on March 1, 2021. (A.P. Doc. No. 51) Gerstenecker raised several salient points in her objection. She pointed to the Debtor and Jack Wood's previous testimony, as well as to the Court's previous ruling regarding the ownership of the Joint Venture. Gerstenecker contended that the Joint Venture is likely worth in excess of $1.8

million dollars.  Using the 20% allocation as testified to by Jack Wood and claimed by the Debtor on her income tax forms, the Debtor's interest would be worth at least $360,000.  Gerstenecker also made mention of an audit that was performed on Jack and Margaret Wood's taxes that allegedly concluded that the Debtor owned no interest in the Joint Venture.  No documents could be provided, however, supporting what an unidentified IRS agent allegedly said regarding the Joint Venture. Gerstenecker opined that the current settlement proposed would likely pay far less than even 5% of her claim.

The Court conducted an evidentiary hearing on the Motion on July 14, 2021.  The Trustee, James Wright (Jack and Margaret Wood's accountant), the Debtor, and Gerstenecker all testified at the evidentiary hearing.  The Trustee started the hearing testifying that he believed this bankruptcy estate had two main potential assets: the bank accounts and the Joint Venture.  As for the bank accounts, there were five bank accounts in which the Debtor owned an interest.  The funds in these accounts totaled over $47,700.  Based upon the percentage of owners, the Trustee calculated that the Debtor's interest in these accounts totaled a little less than $18,000.

With respect to the Joint Venture, the Trustee, who is a certified public accountant, testified that he relied upon the Debtor's tax returns and Jack Wood's testimony to conclude that she owned an interest in the Joint Venture.  He knew prior to the filing of the case that upon review of the deeds, all the Joint Venture properties were titled in only the names of Jack or Jack and Margaret Wood.  The Debtor was not listed as an owner on any of the deeds.

The Trustee also testified that the denial of the summary judgment motion influenced him. He believed that because the Court denied the summary judgment motion, that the Court looked unfavorably upon his cause of action.  He made this conclusion despite the order denying the

summary judgment motion being bereft of any commentary by the Court, and after the Court allowed the Defendants to walk-back their deemed admissions. The Trustee testified that he knew the case was not going to be "easy" once the Court denied the summary judgment motion.

The Trustee also testified that he decided to make this settlement based upon an audit that had been performed on Jack and Margaret Wood. He understood that the Debtor had not been audited like her parents. He was told that the IRS had disallowed the Debtor's deductions for the losses incurred by the Joint Venture. He was given this information by Bordy, who had learned of it from Jack and Margaret Wood's attorney, who had learned of it from their accountant, James Wright.

The Trustee also examined the elements he believed were necessary for the Court to find that the Joint Venture was truly a joint venture to which the Debtor owned an interest. He believed there may not have been an intent to form the Joint Venture. He was aware that the Debtor had contributed no money to the Joint Venture and that the Debtor had not made any decisions or exercised any control over the Joint Venture. Finally, there was no documentation evidencing an agreement to divide the profits and losses of the Joint Venture.

As for the settlement, the terms provided for payments totaling $40,000 ($45,000 if not timely made). He further testified that seven of the ten $4,000 payments have already been made and that he expected the remainder of the payments to be timely. As such, the total recovery would be $40,000.

On cross examination, the Trustee admitted he felt he had a strong case when he filed the complaint. He acknowledged being in the courtroom when Jack Wood testified under oath that the Debtor was part owner of the Joint Venture. He was also aware of the lengths the Debtor had gone

10

to avoid paying the debt owed to Gerstenecker.

As for the review of the deeds, the Trustee admitted he already knew the Debtor was not listed on the deeds prior to the filing of the complaint. Notwithstanding the fact that the Debtor was not listed on the deeds, he still believed in his allegations to support the filing of the complaint.

The Trustee was also aware of the Defendants' answer, wherein they admitted that this was a Joint Venture. While the Defendants disputed that the Debtor was paid nothing for her interest, the Defendants admitted, without reservation, that this was indeed a Joint Venture.

With respect to the audit, the Trustee admitted he did not review the audit prior to the mediation and reaching the deal with the Defendants. Instead, he relied upon what he was told by his attorney, who learned of the audit from the Wood's attorney, who had learned of it from the accountant. He never reviewed any documentary findings from the audit as to the Joint Venture prior to the mediation. It was only after the mediation, and after the deal had been struck, that the Trustee learned that the Debtor had not been audited. The Trustee believed that the Wood's audit affected the Debtor. Later, he admitted that the Debtor's return was not affected by the Wood's audit. The IRS never went back and disallowed the Debtor's Joint Venture losses, and never recalculated her tax debt. According to the Wood's accountant, the IRS concluded that there was no Joint Venture. The Trustee never spoke with the IRS agent himself, so he does not know what information the IRS agent relied upon in making this conclusion. The Trustee also admitted that the finding of the IRS agent regarding the existence of the Joint Venture would not be binding upon this Court.

Finally, the Court asked the Trustee how much of the proposed settlement would go to the single creditor in this case. In other words, how much of the $40,000 settlement would go to

11

Gerstenecker.  The Trustee answered none.  He stated that the entire settlement amount would go
to attorney and trustee fees.  Attorney fees had already exceeded $40,000, and consequently there
would be no funds left over to make a distribution to the single creditor in the case, who opposed
the settlement.  With no benefit to the only creditor, the Court asked the Trustee why he had agreed
to this settlement.  His response was simply to "stop the bleeding," meaning the Trustee sought to
halt the accrual of attorney fees.

   The Court also asked the Trustee if he had considered hiring an attorney who would take this
case on a contingency fee basis.  A contingency fee would alleviate the estate of additional attorney
fees, unless the Trustee was successful.  The Trustee stated that in his experience, he had never hired
an attorney on a contingency fee basis. [2]  He stated he would not feel comfortable hiring a
professional on a contingency fee basis.  He would not want to "put them in that situation."
Presumably, the Trustee meant the situation where they might lose and not get paid.  Of course,
there was a possibility his attorney would not get paid, even though hired on an hourly basis, if the
Trustee was unsuccessful in this case.  Professionals would know this going in, and weigh the case
accordingly.  According to the Trustee, the risk of pursuing this action would not benefit the estate.
Under the settlement, however, the estate gets nothing, other than attorney fees and trustee fees.  As
for the single creditor of the bankruptcy estate, she would  get the same result: nothing.  Under this
reasoning, the only benefit to the estate is the cessation of the accrual of attorney fees, a benefit that
could have been achieved without the filing of the complaint or by simply dismissing the action.

   As stated above, the Wood's accountant James Wright ("Wright") also testified.  He is an

---

[2]This is somewhat shocking to the Court considering the sheer number of years the
Trustee has been acting as a Chapter 7 trustee, and the number of cases and bankruptcy estates
the Trustee has administered.

accountant by trade, and long time acquaintance of Jack and Margaret Wood. He testified as to the audit that was performed on Jack and Margaret Wood's taxes for the tax years 2014, 2015, and 2016. He stated the audit began in 2017, and took over three years to conclude. He testified that he did not believe that the real estate business was a joint venture, but that he based this opinion on what Jack Wood had told him. He confirmed that the IRS had determined that all of the Joint Venture losses should be allocated to just the Woods.

He also testified that after the mediation, he prepared an affidavit which was provided to the Trustee.[3] This affidavit is replete with errors and omissions. The affidavit sets forth the wrong tax years for the audit. It also confuses and mixes up the Debtor and Defendants. In parts of the affidavit, Wright refers to the "Debtor" and means the Debtor, while in other parts he refers to the "Debtor" and meant Jack Wood. The first paragraph states that he performed accounting services for the Defendants in relation to the audit of the "Defendants' and Debtor's income tax filing" and that he had "personal knowledge of the facts pertaining to the Defendants' and Debtor's 2016 tax returns. Wright admitted this was also incorrect. First, there was no audit of the Debtor's income tax filings. Next, he had no knowledge of the Debtor's 2016 tax returns.

Paragraph 5 states that the IRS audited the "Defendants and the Debtor for the tax years 2015, 2016, and 2017." As with the first paragraph, this is also factually inaccurate in a number of ways. The Debtor was not audited, and the tax years in question were 2014, 2015, and 2016.

Wright's affidavit goes on to state in ¶ 6 that the "audit resulted in the IRS disallowing the

---

[3] Later it was discovered that in fact he had not prepared the affidavit, but instead it was prepared by the Defendants' attorney. Moreover, Wright made no changes or additions to the original draft provided to him, with the exception of his signature and the completion of the notary block.

Debtor's deductions for the losses Jack Wood attempted to apportion to her because she was not an owner of any real estate business, nor did she have any ownership interest in Jack Wood's personal real estate rental business." As before, this statement is completely inaccurate. In fact, Wright admitted that he had no idea if the IRS disallowed the Debtor's deductions, and admitted he believed that the Debtor was not audited.

Finally, Paragraph 7 indicated that Jack Wood ceased putting deductions for the real estate business on the Debtor's tax return. On cross examination, Wright admitted he had no personal information as to this statement, as he had not ever reviewed the Debtor's tax returns, either prior to 2016 or after 2016.

Unfortunately, upon advice of Wright, Jack Wood disposed of most of his tax records following the audit. In total, Wright's affidavit has almost as many inaccurate statements as accurate statements. The affidavit relied upon by the Trustee in prosecuting this Motion is almost completely devoid of accurate information. Moreover, the Court finds Wright to be lacking in credibility. While he may be an excellent accountant, his personal relationship with Jack Wood clearly influenced his testimony. His answers were tailored to fit the Defendants' argument that the Debtor did not own any interest in the Joint Venture. In short, to the extent the Trustee relied upon Wright, such reliance was misplaced.

The Debtor also testified at the evidentiary hearing. As with her testimony at the evidentiary hearing on the Motion to Convert, the Debtor was consistent in that she has no knowledge of any of her financial affairs. She reaffirmed the Trustee's beliefs that she had no involvement with the Joint Venture. She testified that she made no decisions and exercised no control of the Joint Venture. She acknowledged that she claimed an interest in the Joint Venture on her tax returns, but

14

had no knowledge of how or why she did so. The Debtor stated that the Woods routinely support her and her children, but was unsure as to the origin of the funds used to support her. She also testified as to the bank accounts, claiming no knowledge as to their origin or contents.

On cross, the Debtor contradicted her earlier testimony, acknowledging she was at least aware of some of the accounts, and that some of the funds in those accounts were her tax refunds. She also confirmed her testimony from 2019 that the funds in these accounts were used to fund her litigation against Gerstenecker in Alabama.

Despite the obvious conclusion, the Debtor refused to acknowledge that should the Trustee be successful in this litigation, there would be a high chance that some of the litigation proceeds would be returned to the Debtor. If her single creditor was paid in full, after deducting administrative expenses, any surplus would be refunded to the Debtor by the Trustee. Conceivably, with the excess proceeds, she would not be dependent upon the Woods for her maintenance and support. Conversely, under the proposed settlement, not only would Gerstenecker receive nothing, there would be no surplus to be returned to the Debtor.

Jack Wood was also called as a witness. He stated that he decided to not place these properties in the Debtor's name, but instead kept them in his and / or his wife's name. He admitted to preparing the Debtor's tax returns, and listing the loss allocation for the Joint Venture on those returns. He claimed that the Debtor never took money from the real estate business, but admitted she received support from him which came from the real estate business.

Jack Wood acknowledged that he previously testified that this was a joint venture and that his answer in this adversary proceeding admitted the same. He said he believed it was a joint venture. He tried to explain his current position that the Debtor owned no interest in the real estate

15

business by stating that he wanted it to be a joint venture, but was told that it was improper, and hopefully "not unlawful." When asked if it was possible that he gave the Debtor an interest in the business, he stated that he did not, even though he believed that he had. Jack Wood testified that the funds given to the Debtor were derived mainly from the Joint Venture. The house the Debtor occupies rent free is property owned by the Joint Venture, and the vehicle the Debtor drives is a vehicle owned and used by the Joint Venture. Rather than these benefits being distributions of the Joint Venture to a partial owner, Jack Wood insisted they were instead just the gifts of a father to his daughter.

Mr. Wood was also asked about the value of the real estate business. He testified that the Joint Venture owns a number of parcels of real property, mostly located in Jefferson County Kentucky. According to the Property Valuation Administrator ("PVA"), the real estate parcels are valued at approximately $1,952,800. Using this figure, if the Debtor owned a 20% interest, she would own 20% of $1,952,800 ($390,560). Of course, PVA values are notoriously conservative and the real estate business may be worth far more.

As with the Trustee, the Court asked Mr. Wood what benefit would go to the only creditor in this case from this settlement. Like the Trustee, Mr. Wood believed the creditor would receive nothing.

Finally, Gerstenecker testified at the evidentiary hearing. She stated that her claim against the Debtor is now over $110,000, and that she has not received anything on this debt other than a small amount received on a garnishment. Gerstenecker did not believe the settlement between the Trustee and the Defendants was fair, in that Jack Wood admitted under oath that the Debtor owned an interest in the real estate business, but now seemingly has changed his mind. As for the

settlement, she did not believe her views were taken into account by the Trustee. She says she informed the Trustee from the beginning that she, the only creditor, opposed this settlement, and would object to same if he pursued it. Gerstenecker expressed her frustration with trying to collect from the Debtor, accusing the Debtor of managing her circumstances to avoid repayment. She accuses the Debtor of working at lower paying jobs, or of working limited hours just to prevent wage garnishment. She noted that it was her efforts that led to the revelation of the errors and omissions in the Debtor's schedules. She shared information with the Trustee, including many documents, which the Trustee used to support his complaint. It was her efforts, and money, that was used to prevent the Debtor from converting to Chapter 13.[4] She incurred over $45,000 in attorney fees to keep the case in Chapter 7 so that these matters could be properly investigated by the Trustee. She believed that when her request for attorney fees was denied, the Trustee would use his best efforts to recover funds that could be distributed to her. She believes that if this settlement is approved, she will never recover on her judgment against the Debtor. Finally, she understood the settlement would bring her, the only creditor, nothing.

## III. LEGAL DISCUSSION

Generally speaking, the law favors compromise and not litigation. *In re Fishell*, 47 F.3d 1168 (6th Cir. 1995) (*citing In re A & C Props.*, 784 F.2d 1377 (9th Cir. 1986)). To facilitate this policy, Bankruptcy Rule 9019(a) authorizes a trustee to seek a compromise or settlement of claims available to the debtor, upon motion and after notice and a hearing. *See* Fed. R. Bankr. P. 9019(a).

---

[4] It is somewhat surprising to the Court that the Trustee accused Gerstenecker of letting him "do the heavy lifting" to pursue this case. As noted earlier, Gerstenecker is the only reason this case stayed in Chapter 7, rather than converting to Chapter 13. But for Gerstenecker's efforts and "heavy lifting," there would have been no Chapter 7 case at all.

The purpose of such a compromise agreement "is to allow the trustee and the creditors to avoid the expenses and burdens associated with litigating sharply contested and dubious claims." *In re A & C Props.*, 784 F.2d 1377, 1380-81 (9th Cir.1986).

The bankruptcy court is charged with an affirmative obligation to apprise itself "of all facts necessary to evaluate the settlement and make an 'informed and independent judgment'" as to whether the compromise is fair and equitable. *LaSalle Nat'l Bank v. Holland (In re Amer. Reserve Corp.)*, 841 F.2d 159, 162-63 (7th Cir. 1987) (*quoting Protective Commonwealth. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968)).

The United States Supreme Court has instructed bankruptcy courts engaged in making such determinations to "form an educated estimate of the complexity, expense, and likely duration of such litigation, the possible difficulties of collecting on any judgment which might be obtained, and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise." *TMT Trailer Ferry, Inc.*, 390 U.S. at 424. From this directive, federal courts have developed four separate factors a bankruptcy court should consider when determining if a compromise or settlement should be approved. These factors are as follows: (a) the probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises. *In re Bard*, 2002 WL 31371984, at *2 (6th Cir. 2002).

The Trustee bears the burden of establishing that the compromise is fair and equitable. While the Court does not have to conduct a "mini-trial" on the merits of the underlying litigation, "[a]pproval of a compromise under Bankruptcy Rule 9019 requires more than just a

'rubber-stamping' of an agreement." *In re Kay*, 223 B.R. 816, 819 (Bankr. M.D. Fla. 1998). As a general matter, this Court agrees with the general policy of encouraging settlements and favoring compromises to reduce the costs of litigation. In evaluating the Trustee's proposed settlement, "the court's role is to ensure that the trustee has exercised proper business judgment in making the decision to agree to the proposed settlement." *In re Ballou*, 2011 WL 4530314, at *5 (Bankr. M.D. Fla. 2011) (*quoting In re Arkoosh Produce, Inc.*, 03.3 I.B.C.R. 149, 153 (Bankr. D. Idaho 2003)).

Courts give trustees considerable deference to exercise their business judgment with respect to settlements. *See In re HyLoft, Inc.*, 451 B.R. 104, 110 (Bankr. D. Nev. 2011) (*citing In re Churchfield*, 277 B.R. 769, 773-74 (Bankr. E.D. Cal. 2002); *In re Ashford Hotels, Ltd.*, 226 B.R. 797, 802 (Bankr. S.D.N.Y. 1998); *In re 110 Beaver Street Partnership*, 244 B.R. 185, 187 (Bankr. D. Mass. 2000); and *In re Adley*, 333 B.R. 587, 608 (Bankr. D. Mass. 2005)). The Trustee's business judgment, however, is not without limits. *See In re Engman*, 331 B.R. 277, 300 (Bankr. W.D. Mich. 2005) (courts gave minimal deference to the trustee's business judgment). "There must be at least some rational business purpose to support the disinterested trustee's decision." *Engman*, 331 B.R. 277 at 300 (trustee's proposed settlement was outside the bounds of what an informed businessperson would have accepted and, as a result, could not be approved by the court). This judge, as a former Chapter 7 trustee, knows that trustees must be given some deference in how to handle the claims entrusted into their care. Nevertheless, the trustee acts on behalf of the bankruptcy estate, which is made up of a debtor's creditors.

**A. Probability of Success in the Litigation**

With this framework in mind, the Court will examine the four factors set forth by the Supreme Court in the *TMT Trailer Ferry* case. With respect to the first prong to consider, the

probability of success on the merits, the Trustee has concluded that he does not believe he has a high chance of prevailing in this case on the merits.  He bases this conclusion on several factors, namely his examination of the deeds, this Court's denial of his summary judgment motion, the opinion of the accountant Wright, and the opinion of the mediator.  The Court finds the Trustee's analysis flawed.  In fact, under the circumstances laid out above, the Court finds there is an extremely high chance of the Trustee prevailing on the merits.

The crux of this case hinges on whether the Debtor owned a portion of the Joint Venture. The Defendants contend that she does not own an interest in the Joint Venture.  Unfortunately, for them, they admitted in their answer that the Debtor did in fact own an interest in the Joint Venture. Their answer constituted a judicial admission on this element of proof.

A judicial admission arises by way of factual assertions in pleadings, stipulations, statements in pretrial orders, and by responses to requests to admit.  *American Title Insurance Company v. Lacelaw Corporation*, 861 F.2d 224, 226 (9th Cir. 1988); *In re Prairie Trunk Railway*, 1991 WL 149601 (Bankr. N.D. Ill. 1991); *White v. ARCO/Polymers, Inc.*, 720 F.2d 1391, 1396 (5th Cir. 1983) ("The general rule is that factual assertions in pleadings and pretrial orders are considered to be judicial admissions conclusively binding on the party who made them.").  Once it is determined that a statement is a judicial admission it is within the court's discretion whether to accept or reject it. *In re Applin*, 108 B.R. 253, 258 (Bankr. E.D. Cal. 1989).  If the court accepts the judicial admission, it is conclusively binding upon the party that made it.  *American Title*, 861 F.2d at 226; *See also In re Schraiber*, 141 B.R. 1000, 1006 (Bankr. N.D. Ill. 1992).

In order to qualify as judicial admissions, a party's statements must be deliberate, clear and unambiguous.  *MacDonald v. General Motors Corp.*, 110 F.3d 337, 340 (6th Cir. 1997).  Some

degree of formality is entailed. An inadvertent statement by counsel is more likely to be treated as an evidentiary admission than a judicial admission. Evidentiary admissions, unlike judicial admissions, are mere evidence, are not conclusive, and may be contradicted by other evidence. *In re Applin*, 108 B.R. 253, 258 (Bankr. E.D. Cal.1989). "Unlike ordinary admissions, which are admissible but can be rebutted by other evidence, judicial admissions are conclusive on the party making them. Because of their binding consequences, judicial admissions generally arise only from deliberate voluntary waivers that expressly concede for the purposes of trial the truth of an alleged fact." *U.S. v. Belculfine*, 527 F.2d 941, 943 (1st Cir. 1975) (citations omitted); *MacDonald v. General Motors Corp.*, 110 F.3d 337, 340 (6th Cir. 1997).

The Court is aware that there is a line of cases holding that a judicial admission made in one proceeding is not an admission in a separate, second proceeding. *See Universal American Barge Corp. v. J–Chem, Inc.*, 946 F.2d 1131, 1142 (5th Cir.1991). Under this reasoning, the Defendants could argue that Mr. Wood's testimony made during the hearing on the Motion to Convert are not binding judicial admissions in this adversary proceeding. Such an argument fails, however, because the operative admission at play here was made in the Defendants' answer in this adversary proceeding.

In this case, the Defendants' answer with regard to the Debtor's ownership interest in the Joint Venture was "deliberate, clear and unequivocal" and made in the course of this judicial proceedings. As such, it qualifies as a judicial admission. *Gowan v. Lefkas General Partners (In re Lefkas General Partners)*, 153 B.R. 804, 807 (N.D. Ill. 1993) (*citing cases*); *In re Jones*, 197 B.R. 949, 956 (Bankr. M.D. Ga. 1996). As stated above, the Trustee's complaint alleged that the notation on the Debtor's tax returns reflected that the Debtor owned a 20% interest in the Joint

21

Venture. (A.P. Doc. No. 1 at ¶34)  Paragraph 35 alleged that Jack Wood confirmed this division of the Joint Venture. The Defendants admitted in their answer the allegations in both paragraphs.  The Defendants cannot simply ignore this admission as if it never happened.  *See Ferguson v. Neighborhood Hous. Servs.*, 780 F.2d 549, 551 (6th Cir. 1986). ("[U]nder federal law, stipulations and admissions in the pleadings are generally binding on the parties and the Court. Not only are such admissions and stipulations binding before the trial court, but they are binding on appeal as well.").

In the *Ferguson* case, the plaintiff sued her former employer, NHS, for alleged discrimination based upon a claim of unequal pay.  *Id.* at 550. The plaintiff alleged in her complaint that NHS was an employer within the meaning of the Fair Labor Standards Act.  *Id.*  NHS admitted this fact in its answer, and did not challenge its status as an employer until shortly before the trial was scheduled to begin.  *Id.*  The trial court did not permit NHS to revoke its admission. NHS eventually appealed and the United States Court of Appeals for the Sixth Circuit affirmed. *Id.*

Here, like in *Ferguson*, the Defendants admitted the Debtor owned a 20% interest in the Joint Venture.  Like in *Ferguson*, the Defendants now try to disavow that admission and challenge this already admitted to fact.  Like in *Ferguson*, this Court would reject the Defendants' attempt and bind them to their admission.  This conclusion is further support by the *Barnes v. Owens-Corning Fiberglas Corp.*, 201 F.3d 815 (C.A.6 (Ky.),2000) case wherein the Sixth Circuit adopted the principles set out in the *American Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224 (9th Cir.1988) case and held "[judicial] admissions are formal admissions in the pleadings which have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact." *Id.* at 829 (*quoting American Title* at 226) and *In re Fordson Engineering Corp.*, 25 B.R. 506, 509 (Bankr. E.D. Mich.1982).

As stated above, the Court has the discretion to reconsider the subject matter of a judicial admission upon a showing of exceptional circumstances. *Ferguson*, 780 F.2d at 551 (*citing New Amsterdam Cas. Co. v. Waller*, 323 F.2d 20, 24 (4th Cir. 1963), cert. denied, 376 U.S. 963 (1964) ("[A] court, unquestionably, has the right to relieve a party of his judicial admission if it appears that the admitted fact is clearly untrue and that the party was laboring under a mistake when he made the admission.")). Nevertheless, generally speaking, judicial admissions are favored, as they "eliminate the need for evidence on the subject matter of the admission." *Ferguson* at 551.

In this case, the Defendants have not shown any circumstances, much less exceptional circumstances, that would warrant relief from the judicial admission in their answer. Nor can the Court find such admission "clearly untrue" in that the admissions echo what was stated under oath in the evidentiary hearing on the Motion to Convert, and what was claimed by the Debtor on her tax returns.

When viewed in this light, it appears that the Trustee would have a very high probability of prevailing on the merits, despite the Defendants assertions to the contrary. Upon the facts in the present case, in all likelihood, the Court would find that the Defendants' answer is a binding admission and would be treated as such. *Fabery v. Mid-South Ob-Gyn, P.L.L.C.*, 2008 WL 11322122, at *1 (W.D. Tenn. 2008).

Even without the conclusive nature of the judicial admission, the Trustee could still prevail on this issue through the application of judicial estoppel. The doctrine of judicial estoppel "generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *See New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (*quoting Pegram v. Herdrich*, 530 U.S. 211, 227 n. 8 (2000)). Judicial estoppel

"preserve[s] the integrity of the courts by preventing a party from abusing the judicial process through cynical gamesmanship." *Browning v. Levy*, 283 F.3d 761, 776 (6th Cir.2002) (*quotation omitted*). The Sixth Circuit has described judicial estoppel as a rule against "playing fast and loose with the courts," "blowing hot and cold as the occasion demands," or "hav[ing] [one's] cake and eat[ing] it too." *Reynolds v. Comm'r*, 861 F.2d 469, 472 (6th Cir.1988) (citations omitted) (alteration in original).

The Supreme Court has noted that "the circumstances under which judicial estoppel may appropriately be invoked are probably not reducible to any general formulation or principle." *New Hampshire v. Maine*, 532 U.S. 742, 750, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001). Nevertheless, despite the "amorphous nature of judicial estoppel," *Alternative Sys. Concepts, Inc. v. Synopsys, Inc.*, 374 F.3d 23, 30–31 (1st Cir.2004), the Supreme Court identified three considerations that are typically relevant in determining whether judicial estoppel should apply: (1) "a party's later position must be clearly inconsistent with its earlier position"; (2) "whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceedings would create the perception that either the first or the second court was misled"; and (3) "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Id.* at 750–51, 121 S.Ct. 1808 (*internal quotes and citations omitted*). In *Browning v. Levy*, 283 F.3d 761, 775 (6th Cir.2002), the Sixth Circuit, focusing on the first two factors identified in *New Hampshire*, described judicial estoppel as barring a party from "(1) asserting a position that is contrary to one that the party has asserted under oath in a prior proceeding, where (2) the prior court adopted the contrary position either as a preliminary matter or as part of a final disposition."

24

*Browning*, 283 F.3d at 775 (*internal quotation omitted*).

In this case, both of the factors set forth in *Browning* are present. First, the Defendants denial of the Debtor's interest in the Joint Venture in this case is without question contrary to Jack Wood's sworn testimony during the evidentiary hearing on the Debtor's Motion to Convert. Several times during that evidentiary hearing, Jack Wood, under penalty of perjury, clearly, definitively, and without any qualifications, testified that the Debtor was a partial owner of the Joint Venture. Now, after the Trustee took him at his sworn word and pursued the Debtor's interest, the Defendants deny that the Debtor owned an interest.

Turning to the second element, there can be no question that the Court adopted the previous position that the Debtor owned an interest in the Joint Venture when it denied the Motion to Convert and when it denied the Motion for Order Awarding Attorney Fees as a Sanction for Debtor's Bad Faith Conduct. With respect to the Motion to Convert, one of the reasons the Court denied the Motion to Convert was Jack Wood's direct testimony that the Debtor owned the interest in the Joint Venture. It was this interest that would have been used to potentially pay the claim of Gerstenecker in the Chapter 7. As for the motion regarding the request for attorney fees, one of the reasons that request was denied was that the Trustee's "investigation [could] lead beyond just the Debtor." To now change course and deny the very facts that those orders were, in part, based upon would be an extreme abuse of "the judicial process through cynical gamesmanship." *Browning v. Levy*, 283 F.3d 761, 776 (6th Cir.2002) (*quotation omitted*).

Finally, even if the judicial admission was not issue determinative, and even if the Court declined to use judicial estoppel to prevent the Defendants from flip-flopping on this issue, the Court would have no problem finding the Debtor owned an interest based upon the prior sworn testimony

25

and the tax returns, notwithstanding the Defendants averments to the contrary now.  As has been found before, and maybe needs repeating now, Jack Wood has very little credibility before this Court, having demonstrated a willingness to bend the truth to suit his needs at any time.  The prior testimony, the tax returns, and the Debtor's use of business assets (her home and vehicle, as well as funds derived from rental income), would be more than sufficient for the Trustee to carry his burden of proof on the issue of the Debtor's interest in the Joint Venture, notwithstanding the absence of the Debtor's names on the deeds or the testimony of Jack Wood.

The Court will take a moment to address some of the other factors relied upon by the Trustee in agreeing to accept this settlement.  As stated above, the Trustee based his decision in part on this Court's denial of his motion for summary judgment.  That decision must be looked at in context. At that time, the Court had just allowed the Defendants to withdraw their deemed admissions due to their failure to timely respond to the Trustee's discovery.  It would have been inconsistent to allow deemed admission to be withdrawn and then turn around and grant summary judgment based upon those deemed admissions.  Moreover, and maybe more importantly, the issue of damages could not have been decided by the summary judgment motion.  While the issue of the Debtor's interest in the Joint Venture is clear, the value of that interest had not yet been determined.  Evidence needed to be presented to arrive at a figure representing the Debtor's 20% interest in the Joint Venture.  As such, the Trustee conclusion that the denial of the summary judgment motion was indicative of this Court's confidence in his case was simply incorrect.

The Trustee's reliance upon the representations of the accountant James Wright was also misplaced.  As can be seen from the recitation of Wright's testimony above, he would not have been a good witness for the Defendants.  His testimony and affidavit were clearly contradictory and full

26

of misstatements.  Moreover, his testimony that he was told by an unnamed IRS agent that this was not a Joint Venture would be both inadmissable hearsay, and not credible.  Not only is the Court unsure if such a statement was ever made, the Court would not be bound by the conclusion of an IRS agent.  It is the function of the courts to make legal determinations, and whether something is a joint venture is a legal conclusion.  While the Court might be influenced by the IRS agent's opinion, that opinion would not be conclusive on the Court.  At this point, the Court has no way to know what exactly the IRS agent said, or what information was presented to that agent to form the basis of his/her opinion.

Finally, the Trustee also relied upon the comments made by Judge Lloyd at the mediation. The Court will not delve into this very much because matters discussed at mediation should not and are not admissible at trial.  Because the Court is unaware, and will remain unaware, what was said to the mediator, the Court cannot make a determination of whether the Trustee's reliance on the mediator's comments was misplaced.  The Court does note, however, that Gerstenecker, the only creditor, was not a party to the mediation, therefore the mediator could not take her position into consideration in forming her opinion.

To conclude with this first element, the probability of success in the litigation, the Court finds this weighs against approving the settlement.  Indeed, short of a hearing on damages, this case could likely be decided on a Motion for Judgment on the Pleadings under Fed. R. Bankr. P. 7012(c). Simply stated, the Trustee could easily prevail on the only contested issue, the Debtor's interest in the Joint Venture.

**B. The Difficulties, If Any, to Be Encountered in the Matter of Collection**

The Court now turns to the second element for approving a compromise, the difficulties, if

any, to be encountered in the matter of collection.  The Trustee conceded this point at the evidentiary hearing – that collection would not be a problem.   The Court agrees.  Collection is a non-issue; if the Trustee were successful in the litigation against the Defendants, the result would be a judgment entered, to which the Trustee could execute against the Defendants' substantial assets.  The Court does not believe it would be difficult for the Trustee to collect on the judgment from the Defendants. As stated above, the Joint Venture possesses real properties totaling over $1.9 million dollars, using a _very_ conservative PVA value.   Using the 20% ownership interest as evidenced on the tax returns, would mean the Trustee would be entitled to collect some $380,000.  This amount could easily be collected through a liquidation of a portion of the Joint Venture's real properties.  This element also weighs against approving the settlement.

## C. The Complexity of the Litigation Involved, and the Expense, Inconvenience and Delay Necessarily Attending it

The third element, the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it, also weigh against approving the settlement.  First, this is not a complex case, once the issue of the Debtor's interest is removed from the equation.  As stated above, this ownership issue could be decided on a relatively simple judicial admissions basis.   The inconvenience and delay are also not factors.  Other than maybe hiring an appraiser to get a fair market value as opposed to a PVA value for the real properties, the Court is unsure how much more discovery either side would need.  This case could be set for trial in a matter of weeks.

## D. The Paramount Interest of the Creditors and a Proper Deference to Their Reasonable Views in the Premises

Finally, and perhaps in this case most importantly, the paramount interest of the creditors and

a proper deference to their reasonable views definitely weighs against approval of this settlement. As stated above, every witness with knowledge testified that this settlement would result in nothing for the single creditor. Even if the other three elements weighed in favor of the settlement, the Court would not be inclined to approve of this settlement in light of the return ( or lack of return) to the single creditor. Due to administrative fees, this settlement would dispose of the largest potential asset in this bankruptcy estate for absolutely no return to the single creditor.

This Court has never been asked to approve such a lopsided settlement before by a Chapter 7 trustee. In a single creditor case, where that creditor gets nothing, it is almost inconceivable how the Trustee could argue that this settlement is in the best interest of the estate. Indeed, the estate would be no better off had the Trustee not filed the case, or simply dismissed the case.

When asked by the Court at the evidentiary hearing what benefit to the bankruptcy estate, the Trustee gave a somewhat perplexing answer. He stated the benefit to the estate would be to "stop the bleeding." In this case, the only bleeding the Trustee could be referring to would be attorney fees. If the Trustee's goal was to simply "stop the bleeding" (to end attorney fees), he should have moved to dismiss the case immediately. While containing attorney fees is an admirable goal, it cannot be the only goal of a Trustee pursuing claims on behalf of a bankruptcy estate. If this were the case, no trustee would ever file an action on behalf of the bankruptcy estate simply to avoid the accrual of attorney fees.

Along this same line, when asked if the Trustee had considered using an attorney on a contingency fee basis, the Trustee responded that he had never hired an attorney on a contingency basis. This is astounding to the Court considering the number of years and cases that have been administered by the Trustee. This implies that the Trustee has never administered a bankruptcy case

with potential assets in the form of automobile accidents claims, medical malpractice claims, or other claims that are handled primarily on a contingency fee basis. The Court is in no way stating that Trustee's counsel should not have been hired on an hourly basis, but it is startling to learn that a Trustee with this much experience has never hired an attorney on a contingency fee basis to represent a bankruptcy estate.

As stated above, the parties concede this settlement would result in no benefit to the single creditor of this bankruptcy estate. When Gerstenecker was asked by the Trustee about this proposed settlement, Gerstenecker in no uncertain terms informed the Trustee that she would not support this compromise. She clearly and unequivocally told the Trustee that she would oppose this settlement. Nevertheless, the Trustee decided to proceed with this Motion to Approve Settlement. In doing so, the Trustee has unnecessarily inflated the costs, including attorney fees, of both Gerstenecker and himself.

It is clear that Gerstenecker's reasonable views on this lopsided settlement were not considered by the Trustee. Indeed, from a purely objective standpoint it appears that the only views considered were those of the Trustee and his concern over administrative fees. The Trustee is charged with representing the interests of the bankruptcy estate and, in this case, its sole creditor. Thus, her reasonable views should have been given more weight by the Trustee. This element also weighs against approving this settlement.

## IV. CONCLUSION

Both the law and this Court favor settlements, but the proponent of the settlement must persuade the court that the settlement is in the best interests of the bankruptcy estate. *In re HyLoft, Inc.*, 451 B.R. 104, 109 (Bankr. D. Nev. 2011). In most cases, the Court is very reluctant to

30

disregard the business judgment of the Trustee with respect to settlement of the bankruptcy estate's claims.  Generally speaking, the bankruptcy trustee is more informed about the facts of their case, having conducted discovery and reviewed the relevant document production.  In this case, however, considering these circumstances, the Court cannot approve this settlement.  The Trustee has not met his burden of proof with regard to the four elements necessary for the Court to approve this settlement or persuaded the Court that the settlement is in the best interests of the estate.  Indeed, all four elements, in this Court's view, weigh against approving this settlement.  The Trustee may either attempt to settle this matter again, with an eye toward some benefit to the sole creditor, or pursue this matter to trial.  The Court will sustain Gerstenecker's objection and the Motion to Approve Settlement Agreement will be denied.  The Court will enter an Order this same date in accordance with the holding of this Memorandum.

Alan C. Stout
United States Bankruptcy Judge

Dated: August 17, 2021

UNITED STATES BANKRUPTCY COURT
FOR THE
WESTERN DISTRICT OF KENTUCKY

| | | |
|---|---|---|
| IN RE: | ) | |
| JULIE MARIE WOOD | ) | CASE NO. 18-32555 |
| Debtor | ) | CHAPTER 7 |
| _____ | ) | |
| | ) | |
| MICHAEL WHEATLEY, | ) | |
| in his capacity as Chapter 7 Trustee | ) | A.P. No.  19-3041 |
| Plaintiff | ) | |
| vs. | ) | |
| | ) | |
| JACK WOOD, | ) | |
| JENNIFER WOOD, and | ) | |
| MARGARET WOOD | ) | |
| Defendants | ) | |
| _____ | ) | |

**ORDER**

Pursuant to the Court's Memorandum entered this same date and incorporated herein by reference,

It is hereby **ORDERED** that the Motion to Approve Settlement Agreement is **DENIED.**

It is further **ORDERED** that Gerstenecker's Objection to the Motion to Approve Settlement Agreement is **SUSTAINED**.

_____
Alan C. Stout
United States Bankruptcy Judge
Dated: August 17, 2021